[Cite as *State v. Conrad*, 2025-Ohio-5499.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

STATE OF OHIO,

Plaintiff - Appellee

-vs-

JEREMIAH CONRAD,

Defendant – Appellant

Case No. 2024 CA 0099

<u>Opinion And Judgment Entry</u>

Appeal from the Richland County Court of
Common Pleas, Case No. 2024 CR 0103

Judgment:   Affirmed

Date of Judgment Entry: December 9, 2025

**BEFORE:** Andrew J. King; Robert G. Montgomery; Kevin W. Popham, Judges

**APPEARANCES:** JODIE M. SCHUMACHER and MICHELLE FINK, for Plaintiff-
Appellee; ALISON ROTH and SAMANTHA KOVACEVIC, for Defendant-Appellant.

OPINION

*Montgomery, J.*

{¶1}   Defendant-Appellant, Jeremiah Conrad, appeals from the jury verdict from the Richland County Court of Common Pleas, finding him guilty of murder.   For the reasons below, we AFFIRM.

**STATEMENT OF THE CASE**

{¶2}   On Sunday, January 9, 2022, Deanna Hoam was found dead in the bathtub of her apartment, located at 128 Rowaland Avenue, in Richland County.   On February 7, 2024, Defendant-Appellant, Jeremiah Conrad ("Appellant"), was indicted on three counts of murder, two counts of felonious assault, and two counts of gross abuse of a corpse in

connection with Deanna's murder.  Appellant pled not guilty to all charges and proceeded to a jury trial.  On October 28, 2024, the trial began and continued through November 8, 2024, with the State calling over 25 witnesses in addition to admitting numerous exhibits. After deliberations, the jury returned a guilty verdict against Appellant on all seven counts. Counts one through five merged and count seven merged with count six.

{¶3}   On November 19, 2024, Appellant was sentenced to 15 years to life in prison on count one, purposeful murder, and one year in prison for count 6, gross abuse of a corpse. For count six he was also sentenced to two years of discretionary post-release control and ordered to pay $3,000.00 in restitution.  Appellant timely filed his notice of appeal.

### STATEMENT OF RELEVANT FACTS

{¶4}   Deanna Hoam, the victim ("Deanna" or "victim") lived in an apartment on Rowland Avenue in Mansfield, Ohio, located in Richland County.  Her father, Donald Hoam ("Mr. Hoam") paid for her rent and utilities as well as her vehicle, a 2007 red Ford Fusion.  Mr. Hoam testified that Deanna associated with some "dark" people and had drug use and addiction issues.  Nonetheless, he was always there for Deanna, and testified they were in contact three to five times per week, sometimes daily, and that she almost always returned any texts from him.  It was uncharacteristic for her not to respond to Mr. Hoam.

{¶5}   Deanna had a son, Hanif Donaldson, and they also had a close relationship. Hanif testified he texted with his mom almost daily and called nearly every other day. Hanif testified that he met Appellant in November 2021, when they all went shopping one day.  At some point, Appellant was detained for suspected shop lifting.  Deanna and Hanif

left the shopping mall and went home. Later, Hanif was at Deanna's apartment when Appellant called Deanna, stating he was very angry she left him when he was detained for shop lifting. Deanna placed Appellant on speaker phone and Hanif heard Appellant state he was going to kill Deanna. The last time he saw his mom was during Christmas 2021.

{¶6} On January 4, 2022, Appellant had a text conversation with a woman named Jennifer Smith and claimed he had been awake for 3 days. Late in the evening of January 5, 2022, Smith asked Appellant if he had a vehicle and he responded, "I will." Earlier that afternoon, on Wednesday the 5th, Deanna texted her dad that she needed a heater because her apartment was getting cold. Mr. Hoam stated he would get her a heater.

{¶7} In the very early morning hours of January 6, 2022, at approximately 1:30 a.m., Deanna's two neighbors, Shawnda Sexton and Jon Godfrey, returned from their night shifts. A little later, they heard banging noises, like faint thuds, coming from the victim's apartment directly below. Robert Mettler, another neighbor, also woke up to loud yelling and banging on January 6, between 2:00 and 3:00 a.m. Toward the end of the commotion, Mettler testified he heard a voice say, "Please stop" two separate times. Mettler testified that when he left for work a few hours later around 6:00 a.m., he did not see the victim's red car and has not seen it since that night. The neighbors had also seen Appellant with Deanna at the apartment complex on various occasions before the murder.

{¶8} That same morning around 6:30 a.m., Appellant texted a woman named Chandelle Cummings, stating "I got wheels. Going slow." At around 1:00 p.m. on the 6th, Mr. Hoam took the new heater to Deanna's apartment, went inside to the living area,

and plugged it in so the apartment would be warm when she returned. He did not notice anything unusual at that time; he did not leave the living area. However, hours passed, and Deanna did not text Mr. Hoam to thank him for the heater, which was very out of character for her. Thereafter, Mr. Hoam called and texted Deanna several times with no response.

{¶9}   Later in the day on January 6, 2022, around 5:00 or 6:00 p.m., Rachel Brown noticed via her Ring camera that Appellant - a childhood friend - was sitting in a red car in front of her Davidson Road apartment trying to use her wi-fi. Appellant was wearing a black hoodie sweatshirt. Appellant asked Brown if he could come inside, and she said yes. A bit later, Appellant's friend, Michelle Chapman, arrived at Brown's apartment. Appellant and Chapman eventually came inside. Brown overheard Appellant and Chapman discussing going to Motel 6 and that Appellant wanted to hook up a phone to his account. Appellant and Chapman eventually left Brown's house together around 6:59 p.m. At approximately 10:47 p.m., a new Google account was created on Deanna's phone with the name "tedbundythehokilla@gmail.com." *Tr.*, p. 996-998.

{¶10} Chapman testified at Appellant's trial. She first met Appellant on a psychiatric unit, then participated in a drug deal, and has known him for several years. In early January 2022, they reconnected through Appellant's Facebook account, known as "Professor Finesser," because Chapman wanted to exchange gift cards for drugs. Chapman testified that on January 6, 2022, she met Appellant outside of Brown's apartment, and when she and Appellant went inside, Appellant handed her a phone and asked her to reset it, because Appellant knew she briefly worked for Boost Mobile, but

she was unsuccessful.  That's when the two of them left Brown's apartment and drove to Motel 6 to meet Appellant's friends.

{¶11}  Chapman testified that she and Appellant did drugs at the Motel 6 and then drove to Speedway, McDonald's, and back to Motel 6.  When Champman was ready to leave at around 3:00 a.m. on January 7, 2022, Appellant began to drive Chapman back to her car.  While driving, Appellant failed to stop at a stop sign and ran a red light. Lieutenant Ryan Grimshaw, with the Mansfield Police Department, initiated a traffic stop. Grimshaw observed brass knuckles hanging out of Appellant's pocket and noticed a meth pipe in plain sight in addition to bags of syringes on the floorboard near Chapman's feet. Grimshaw next discovered that Appellant had an active warrant for his arrest, so he placed Appellant under arrest.  Another officer drove Chapman back to her own car, still parked at Brown's apartment on Davidson Road.  Chapman later returned to the 2007 red Ford Fusion, broke the window, and stole the items inside to attempt to resell. *Tr.,* p. 712.

{¶12}  Later that morning on January 7, 2022, Mr. Hoam reported Deanna missing. At around 10:00 a.m., Mr. Hoam met Sergeant Gess ("Sgt. Gess") at Deanna's apartment, and they walked through it together.  Mr. Hoam noticed a basket of clothes at the foot of Deanna's bed had been knocked over but nothing else seemed out of the ordinary, although he noted the apartment was extremely messy and cluttered.  Sgt. Gess went into the bedroom and saw drug paraphernalia on the dresser and collected only "a couple of things that were suspected to be illegal." *Tr.,* p. 378.  Sgt. Gess did not enter the bathroom that day.   He testified the bathroom was dark and he could see that no one

was in there. Because it was a missing person report at the time, he did not think it was necessary to check (although hindsight he says he would have).

**{¶13}** After about 20 minutes, Sgt. Gess went outside to his cruiser and entered Hoam's missing vehicle information into LEADS to research potential friends and acquaintances. Sgt. Gess discovered that Deanna's vehicle had been involved in a traffic stop earlier that day, the traffic stop involving Appellant and Chapman. The information led Sgt. Gess to Rachel Brown's apartment. Brown told Sgt. Gess that "they were with [the victim] the night before; that she was in the car and they dropped her off. And that was about the gist of it." *Tr.*, p. 381. Sgt. Gess testified that Brown "reiterated two or three times that she knows she's fine, and she even stated she's not dead." *Id.*

**{¶14}** On January 9, 2022, Mr. Hoam and his wife went looking for Deanna because she still had not responded to him. He returned to Deanna's apartment to use the restroom and decided to pull back the shower curtain and discovered Deanna's deceased body in the bathtub. She was in a fetal position on her left side with her head down by the drain and a lot of blood, the flesh was torn off from her face. *Tr.*, pp. 292-294. Mr. Hoam called 9-1-1. Lead Detective Larry Schacherer and other officers soon arrived at Deanna's apartment. When Schacherer initially entered the apartment, nothing seemed out of place or atypical. However, upon entering the bedroom, he observed that items appeared to be knocked off the shelves and dresser, and he saw what appeared to be blood on the walls and carpet. The State admitted several photographs as exhibits to demonstrate the areas of blood Schacherer noticed, including on the bedroom's light switch, on the refrigerator and floor in the kitchen (what he described as possible transfers of blood), as well as streaks of blood going from "like, the bedroom to the bathroom."

*Tr.,* pp. 952-953. Another photograph revealed blood marks on the wall after detectives moved Deanna's bed away from the wall. One such mark was "substantial," about eight inches in width. *Tr.,* p. 960.

{¶15} Later that day, Mr. Hoam discovered that charges were made to a credit card he gave to Deanna for emergencies, and he informed Detective Schacherer. The charges, including Speedway and McDonald's, were made on Thursday, January 6, 2022. The State provided several lay witnesses that produced and testified regarding video footage from certain business establishments on January 6, 2022. One such video was obtained from the nearby Valero gas station, showing Appellant entering the Valero with Chapman in a red Ford Fusion that was definitively established to be Deanna's car. Additional video evidence showed Appellant and Chapman at McDonald's and Speedway, as referenced above and testified to by Chapman. In each video, Appellant was driving Deanna's car with Chapman as the passenger, and Deanna was nowhere to be seen.

{¶16} At trial, Detective Schacherer identified Appellant as the individual wearing a black sweatshirt who entered the Valero gas station on Ashland Road on January 6, 2022, at 3:08 a.m., in a red 2007 Ford Fusion. Through Detective Schacherer, and over the defense's objection, the State introduced several Facebook threads of conversations between Appellant and different women, demonstrating that Appellant was struggling in the days leading up to Deanna's murder. The State similarly introduced certain messages and chat history between Deanna and Appellant.

{¶17} On January 10, 2022, Michelle Chapman learned from her mother that Detective Ronee Swisher was trying to reach her. Chapman eventually called the

detective and later pulled her car into a garage where the Mansfield Police Department recovered several items determined to be Deanna's, including the apartment security camera, a backpack, a laptop, and Deanna's driver's license. The security company monitoring Deanna's camera reported it was inactive since December 26, 2021. Detectives also took Chapman's cell phone.

{¶18} On January 11, Chapman brought police a second cell phone and Deanna's father's credit card, and on January 17, Chapman brought detectives a third cell phone. Detective Schacherer confirmed that the phones collected belonged to Chapman, Appellant, and Deanna. Jerry Botdorf, a forensic investigator, performed data extractions on the involved cell phones using Cellebrite. Botdorf testified that when a device is older but contains little data, it has likely been "reset." *Tr.*, p. 635. In his opinion, Deanna's phone was reset on January 6, 2022, the day a new email account was established named "tedbundythehokilla."[1]

{¶19} Bryan Mazzolini, a special agent with the United States Secret Service, analyzed the raw data he received from Mansfield Police Department's "geofence" warrants. In essence, Agent Mazzolini took Google's GPS data, consisting of time, date, and location - and put it into a Google Earth map. *Tr.*, p. 444. He created a power point as "a visual representation" of the locations of the device during the time between January 5 and January 6, 2022. *Tr.*, p. 446. The data revealed that Deanna's phone was indeed at the Valero location, the Speedway, and the McDonalds on January 6, as

---

[1]Several items were collected from Appellant at the Richland County jail including multiple pieces of jewelry, all of which belonged to Deanna as identified by her son and her sister. Officers also took the clothing Appellant was wearing upon arrival, including Appellant's tan leather work boots.

referenced above. Again, Appellant and Chapman are clearly seen in the video footage from these businesses, but not Deanna.

{¶20} Thomas Stortz, an investigator with Richland County Coroner's Office, determined that Deanna's cause of death was homicide, with multiple sharp force thrust injuries. The date and time of death was listed as January 6, 2022, at 1900 hours. Bryan Casto, a forensic pathologist with the Montgomery County Coroner, conducted the post-mortem examination and death investigation regarding Deanna. Casto found at least 25 injuries, including stab wounds, incise wounds, and blunt force lacerations to her head and neck area. Casto further reported four stab wounds to Deanna's chest, three to four inches deep that cut through the cartilage and damaged three major organs, along with two smaller stab wounds to her heart and stab wounds to both lungs. Deanna also had defensive wounds with fractures to her right hand, typical of someone fighting off an attack. Casto opined that the cause of death was multiple sharp force trauma. Deanna also had three separate areas on her body that appeared to be bloody shoe prints. *Tr.,* p. 746. Casto collected various swabs and fingernail scrapings for further testing.

{¶21} Dawn Fryback, a DNA analyst, conducted comprehensive scientific DNA testing on the fingernail scrapings from Deanna as well as certain clothing worn by Appellant and collected by law enforcement. The right fingernail scrapings from Deanna indicated the presence of two males, with one "major" male DNA profile matching Appellant. *Tr.,* p. 810. The left fingernail scrapings indicated three potential males, with one "major" DNA match to Appellant. *Id.* A second male's DNA that was submitted for comparison, William "Johnny" Marvicsin, was excluded as to both nail scrapings. *Tr.,* pp. 812-813. Appellant's tan leather boots indicated the presence of blood; the blood on the

boots was a match to Deanna's blood to a reasonable degree of medical certainty. *Tr., p. 828.* Fryback also examined Appellant's black hoodie sweatshirt with indications of blood on the zipper. It indicated the DNA of two people - Appellant was the source of the major DNA profile and Deanna was the source of the minor DNA profile.

## ASSIGNMENTS OF ERROR

{¶22} "I. CONRAD'S MURDER CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, DENYING HIM HIS RIGHT TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION."

{¶23} "II. THE USE OF INFLAMMATORY AND UNADMITTED EVIDENCE DURING OPENING STATEMENTS CONSTITUTED PROSECUTORIAL MISCONDUCT AND VIOLATED CONRAD'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL."

{¶24} "III. THE TRIAL COURT ERRED IN RENDERING AN ORDER OF RESTITUTION WHICH WAS NOT SUPPORTED BY THE EVIDENCE IN THE RECORD. THE TRIAL COURT ERRED IN ORDERING RESTITUTION IN ITS SENTENCING ORDER FOR ECONOMIC LOSS PROPERLY ATTRIBUTABLE TO A CRIME OF WHICH THE DEFENDANT WAS NOT CONVICTED."

{¶25} "IV. THE TRIAL COURT ERRED IN RULING THAT DEANNA HOAM'S STATEMENTS REGARDING THREE WOMEN WERE HEARSAY AND EXCLUDING MR. HOAM'S TESTIMONY ABOUT THESE STATEMENTS FROM EVIDENCE."

### *Manifest Weight of the Evidence*

{¶26} In the first assignment of error, Appellant claims his convictions are against the manifest weight of the evidence. We disagree. Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *State v. Williams*, 2003-Ohio-4396, ¶ 83. When a court of appeals reverses a judgment of a trial court as against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of conflicting testimony. *State v. Jordan*, 2023-Ohio-3800; *Thompkins* at 387; *Williams,* ¶ 60. The reviewing court must determine whether the jury clearly "lost its way and created such a manifest

miscarriage of justice" that the conviction cannot stand, and a new trial must be ordered. *Id.*, quoting *State v. Group*, 2002-Ohio-7247, ¶ 77 (citations omitted). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the exceptional case in which the evidence weighs heavily against the conviction. *State v. Dotson*, 2017-Ohio-5565, ¶ 1 (5th Dist.).

{¶27} In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact. *Eastley v. Volkman,* 2012-Ohio-2179, ¶ 21; *In re Z.C.*, 2023-Ohio-4703, ¶ 14. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the [trier of fact] is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80 (1984). In determining whether a witness is credible, the trier of fact is in the best position to consider inconsistencies in testimony, as well as the witnesses' demeanor and manner of testifying. *Dotson*, ¶ 50. Moreover, a defendant is not entitled to a reversal on manifest weight grounds simply because there was inconsistent evidence presented at trial. *Id.*; *State v. Raver*, 2003-Ohio-958, ¶ 21 (10th Dist.). If the evidence is susceptible to one or more interpretations, a reviewing court must interpret it in a manner consistent with the verdict. *Dotson*, ¶ 49.

{¶28} Further, circumstantial evidence has the same probative value as direct evidence, and a conviction can be sustained based on circumstantial evidence alone. *State v. Mahone*, 2014-Ohio-1251, ¶ 48 (10th Dist.). It is within the province of the jury to consider the probative value of the evidence, whether direct or circumstantial, and to draw reasonable inferences from the facts and testimony in evidence. *Id., at* ¶ 49. Here,

upon review, we find that the jury did not "clearly" lose its way or create a manifest injustice in finding appellant guilty of murdering Deanna. Accordingly, Appellant's convictions are not against the manifest weight of the evidence.

{¶29} The evidence presented at trial suggesting Appellant's guilt is significant. Deanna and Appellant reconnected in November 2021, and they had some type of relationship in the weeks leading up to her murder. The last day that Mr. Hoam had any contact with Deanna was the afternoon of January 5, 2022, when she texted him asking for a heater because her apartment was getting cold. Mr. Hoam delivered the heater to her apartment and plugged it in on January 6, 2022, around 1:00 p.m.

{¶30} Between 3:08 a.m. on January 6, 2022, and the later evening hours that same day Appellant was seen on video with Chapman at multiple locations – Valero, Speedway, and McDonald's. The video footage clearly identifies Appellant and Chapman together using Deanna's 2007 red Ford Fusion, but there is no sign of Deanna. The "geofence" cell phone data traced Deanna's cell phone to the very same locations. Appellant even used the credit card Mr. Hoam gave to Deanna for emergencies to make multiple purchases, including purchases at Speedway and McDonalds. Appellant and Chapman were clearly together after the murder, and Chapman was later found with multiple items belonging to Deanna, including her cell phone. When detectives recovered the phone, they determined that it had recently been reset, on or about January 6, 2022, the same day that a new account was made named "tedbundythehokilla." Appellant was also in possession of Deanna's jewelry, some of which she wore daily. Lead detective Schacherer discovered multiple areas of blood in Deanna's apartment. Deanna's

neighbors heard loud noises coming from her apartment in the early hours of January 6, 2022, and one heard someone say, "Please stop."

{¶31} In addition to the above circumstantial evidence, perhaps most significant is the direct physical DNA evidence in this case. As set forth in the statement of facts, Dawn Fryback performed a comprehensive DNA analysis, including Deanna's fingernail scrapings and certain clothing worn by Appellant. The right fingernail scrapings from Deanna indicated the presence of two males, with one "major" male DNA profile matching Appellant. *Tr.*, p. 810. The left fingernail scrapings indicated three potential males, with one "major" DNA match to Appellant. Deanna had three bloody boot marks on her deceased body. Appellant's boots indicated the presence of blood; the blood on the boots matched Deanna's blood to a reasonable degree of medical certainty. *Tr.*, p. 828. Fryback also examined Appellant's black hoodie sweatshirt with indications of blood on the zipper. It indicated the DNA of two people - Appellant was the source of the major DNA profile and Deanna was the source of the minor DNA profile, again to a reasonable degree of medical certainty.

{¶32} Thus, after examining the entire record, we cannot conclude that the jury clearly lost its way or created such a manifest miscarriage of justice that the conviction cannot stand. To the contrary, significant evidence exists in this case to support the jury's determination that Appellant murdered Deanna in the early morning hours of January 6, 2022. As such, **Appellant's first assignment of error is overruled.**

### *Unadmitted photographs of the victim as a child*

{¶33} In the second assignment of error, Appellant claims the use of "inflammatory and unadmitted evidence" during opening statements constituted prosecutorial

misconduct and violated Appellant's rights to Due Process and a fair trial. More specifically, Appellant argues the State's use of two photographs of the victim as a child, that were later excluded as irrelevant, were so prejudicial that Appellant was denied his right to a fair trial.

**{¶34}** As an initial matter, Appellant objected to the entirety of the prosecution's opening statement before it even began, and provided arguments regarding certain portions of the power point but did not challenge the two photos. The trial court overruled the objection and allowed the prosecution to proceed with opening statements. Only after the State's case in chief did Appellant specifically object to the two photographs of the victim as a child and the trial court agreed, finding them irrelevant to Appellant's guilt. Regardless of the timing of the objection, we find Appellant's argument is without merit.

**{¶35}** The prosecution enjoys wide latitude during opening and closing statements. *State v. Gilbert*, 2005-Ohio-5536, ¶ 13 (10th Dist.). The test for prosecutorial misconduct is, first, whether the conduct is improper, and second, whether the conduct prejudicially affected the substantial rights of the accused. *State v. McConnell*, 2023-Ohio-654, ¶ 34 (5th Dist.), citing *Vill. of Sunbury v. Sullivan*, 2012-Ohio-3699, ¶ 30 (5th Dist.), citing *State v. Lott*, 51 Ohio St.3d 160 (1990). In reviewing allegations of prosecutorial misconduct, an appellate court must consider the conduct complained of in the context of the entire trial. *Darden v. Wainwright*, 477 U.S. 168 (1986).

**{¶36}** A trial is not unfair, if, in the context of the entire trial, it appears clear beyond a reasonable doubt the jury would have found the defendant guilty even without the improper conduct. *State v. Treesh*, 2001-Ohio-4; *State v. White,* 1998-Ohio-363; *State v. Saleh,* 2009-Ohio-1542, ¶ 66 (10th Dist.). In other words, "a defendant's substantial rights

cannot be prejudiced when the remaining evidence, standing alone, is so overwhelming that it constitutes defendant's guilt, and the outcome of the case would have been the same regardless of evidence admitted erroneously." *State v. Hicks*, 2011-Ohio-3578, ¶30 (8th Dist. 2011), *citing State v. Williams*, 38 Ohio St.3d 346, 349-350 (1988).

{¶37} Even assuming, *without deciding*, that the inclusion of two photos of the victim as a child during opening statements constituted prosecutorial misconduct, it simply was not prejudicial to Appellant's right to a fair trial. First, the court instructed the jury that opening statements are simply not evidence and the State must prove each element of the crime beyond a reasonable doubt. *State v. Fannon*, 2018-Ohio-5242, ¶ 58 (4th Dist.), citing *Gilbert*, supra. Second, the two photographs of the victim as a child had little effect upon the jury's determination of Appellant's actual guilt. Indeed, the evidence against Appellant was significant and it is clear that the outcome of the case would have been the same regardless of the use of the photos. See *State v. McConnell*, 2023-Ohio-654 (5th Dist.). As a result, Appellant's right to a fair trial was not violated. **Appellant's second assignment of error is overruled.**

### *Restitution*

{¶38} In his third assignment of error, Appellant argues the trial court erred in rendering an order of restitution for economic loss attributable to a crime for which the defendant was not convicted. Again, we disagree with Appellant.

{¶39} R.C. 2929.18(A)(1) permits a trial court to impose restitution as part of a sentence to compensate a victim for economic loss. The court may base its order of restitution on an amount recommended by the victim, the offender, a presentence investigation report, estimates or receipts indicating the cost of repairing or

replacing property, and other information. However, the amount shall not exceed the amount of the economic loss suffered by the victim as a direct and proximate result of the commission of the offense. R.C. 2929.01(L) defines "[e]conomic loss," as relevant here, as "any economic detriment suffered by a victim as a direct and proximate result of the commission of an offense and includes any * * * medical cost * * * incurred as a result of the commission of the offense." *State v. Jones*, 2015-Ohio-3983, ¶ 12 (10th Dist.); *State v. Dunham*, 2014-Ohio-1042, ¶ 81 (5th Dist.), citing, *State v. Lalain*, 2013-Ohio-3093, syllabus.

{¶40} "An award of restitution is limited to the actual loss caused by the defendant's criminal conduct for which he [or she] was convicted, and there must be competent and credible evidence in the record from which the court may ascertain the amount of restitution to a reasonable degree of certainty." *Jones,* ¶ 13. The evidence supporting a restitution order can be either documentary or testimonial evidence. *State v. DeJoy*, 2011-Ohio-2745, ¶ 33 (10th Dist.), citing *State v. Holt*, 2011-Ohio-1582 (8th Dist.). Generally, an appellate court reviews restitution orders under an abuse of discretion standard. To find an abuse of discretion, an appellate court must determine the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. *State v. Cook*, 2017-Ohio-1503 (5th Dist.).

{¶41} A defendant who does not dispute an amount of restitution, request a hearing, or otherwise object *at the sentencing hearing* waives all but plain error regarding the order of restitution. *State v. Ratliff*, 2011-Ohio-2313, ¶14 (2d Dist.); *State v. Sheets*, 2018-Ohio-996 (5th Dist.); *State v. Patterson*, 2025-Ohio-4933 (5th Dist.). Thus, a trial court is required to conduct a hearing on restitution only if the offender, victim, or survivor

disputes the amount of restitution ordered. *Id*., at paragraph two of the syllabus; R.C. 2929.18(A)(1).

**{¶42}** Here, Appellant utterly failed to object at the sentencing hearing regarding restitution and likewise, does not raise a plain error argument on appeal. For that reason alone, Appellant's assignment of error is wholly without merit. However, even if Appellant raised the plain error argument on appeal, such error simply does not exist. To establish plain error, Appellant must show an error occurred, the error was obvious, and there is a reasonable probability that the error resulted in prejudice, meaning the error affected the actual outcome of the trial. *State v. McAlpin*, 2022-Ohio-1567, ¶ 66, citing *State v. Rogers*, 2015-Ohio-2459, ¶ 22. Under this standard, the defendant bears the burden of "showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice." *State v. Quarterman*, 2014-Ohio-4034, ¶ 16.

**{¶43}** An appellate court has discretion to notice plain error and therefore "is not required to correct it." *State v. West,* 2022-Ohio-1556, ¶ 22, citing *State v. Rogers*, 2015-Ohio-2459, ¶ 24. Here, Appellant was convicted beyond a reasonable doubt on all seven charges against him, including the murder of Deanna by blunt force trauma. After the murder, Appellant took the victim's car and he and Chapman drove around for many hours together using Mr. Hoam's credit card, taking Deanna's personal items, including her cell phone. Appellant was ultimately arrested, after a traffic stop, due to an active warrant. The police took Deanna's car back to a location and locked it, but Chapman later came back and smashed the car to retrieve items that she hoped to later sell. Every one of these events occurred at the hands of Appellant, after brutally murdering the victim.

Thus, we will not recognize plain error in this matter and reversal is not necessary to correct any "manifest miscarriage of justice."

### *Hearsay Exception – Excited Utterance*

**{¶44}** In the fourth and final assignment of error, Appellant asserts that the trial court improperly excluded statements Deanna made to Mr. Hoam shortly before her death that demonstrate Deanna was being threatened and targeted by multiple people. Prior to her murder, Deanna called her father to tell him that three unnamed women had come to her apartment complex, broke the windshield of her car, and dented the sides when trying to taunt her. At some point, Deanna also told Mr. Hoam that she "feared for her life." *Tr.*, p. 338. Defense counsel claimed that Deanna feared for her life because of the three unnamed women's behavior and proffered Mr. Hoam's testimony regarding these statements.

**{¶45}** Appellate courts review challenges to the admissibility of hearsay statements for an abuse of discretion, provided an objection is made at trial. *State v. Smith*, 2019-Ohio-3257, ¶ 15 (1st Dist.); *State v. Ocanas*, 2023-Ohio-951, ¶ 29 (5th Dist.); *In re S.H.W.*, 2016-Ohio-841, ¶ 17 (2d Dist.). "A trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271 (1991). An abuse of discretion implies more than an error in judgment; it is arbitrary, capricious, or unreasonable. *State v. Coriell*, 2023-Ohio-4113, ¶¶ 30-31 (5th Dist.).

**{¶46}** Generally, hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence "to prove the truth of the matter asserted."

Evid.R. 801(C). Hearsay is not admissible, unless an exception exists as provided by the U.S. or Ohio Constitutions, by statute, or by rule. In turn, Evid.R. 803(2) sets forth a hearsay exception for statements that are considered "excited utterances," defined as statements "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *See State v. Carter*, 2017-Ohio-7443, ¶ 8 (3d Dist.); *State v. Railey*, 2024-Ohio-5502, ¶ 33 (1st Dist.).

**{¶47}** To be admissible as an excited utterance, four requirements must be met: (1) a startling event produced a nervous excitement in the declarant, (2) the statement was made while still under the stress of excitement caused by the event, (3) the statement relates to the startling event, and (4) the declarant personally observed the startling event. *State v. Brown*, 112 Ohio App.3d 583, 601 (12th Dist. 1996). "The excited utterance exception to the hearsay rule exists because excited utterances are the product of reactive rather than reflective thinking and, thus, are believed inherently reliable." *State v. Ducey*, 2004-Ohio-3833, ¶ 17 (10th Dist.); *State v. Hopkins*, 2018-Ohio-1864, ¶ 36 (2d Dist.); *State v. Akers*, 2021-Ohio-2562, ¶ 13 (5th Dist.) (noting that the rule protects statements or declarations that are spontaneous and unreflective); *State v. Duncan*, 53 Ohio St.2d 215 (1978). In *Duncan,* the Ohio Supreme Court expansively reflected on this exception to the hearsay rule:

> Testimony as to a statement or declaration may be admissible under an exception to the hearsay rule for spontaneous exclamations where the trial judge reasonably finds (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and

declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declarations spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.

*Id.,* at syllabus.

**{¶48}** Here, as set forth, defense counsel claimed Deanna's statements to Mr. Hoam that she feared for her life was connected to the behavior of the three unnamed women who were taunting and threatening her. The defense proffered the following relevant testimony from Mr. Hoam, outside the presence of the jury. *See Tr.*, pp. 330-352.

Q.    Do you remember speaking to the police * * * on January 10th?

A.    January 10th? What day of the week is that?

Q.    I believe Sunday was the day that you entered the apartment and found your daughter deceased, and that was on the 9th. So I believe the 10th would have been the very next morning, Monday. * * *

Q.      Did you talk to them about your daughter fearing somebody trying to kill her?

A.      Did I talk to them about someone wanting to kill her?

Q.      That she felt someone was trying to kill her?

A.      She told me she feared for her life and she would like to move to another place.

Q.      What had happened that caused her to fear for her life?

A.      I'm not sure.

Q:      Did you tell police about three women beating up her car and taunting her and demanding she come out and she indicated to you that caused her to fear for her life?

A.      Would that be considered hearsay?

Q.      You're allowed to answer.  That's why they're [the jury] not in here right now.

The Court:  If you remember, I mean, if you remember this conversation.  If you do, you do.  If you don't, you don't.

A.      Yeah, that's entirely possible.

Q.      Did you - - you told the police in the statement that that - - I think your exact words were she told me I think it was Monday that they broke the windshield in her car and put some dents in the side of her car when they came out trying to taunt her again.  Did you mean that prior Monday?

A.    I don't remember that conversation at all.  I don't remember.  I don't remember that conversation, I really don't.  * * * [the witness reads his prior statement to police on the witness stand]

Q.    And you testified just a few seconds or minutes ago that she was concerned enough she wanted to move?

A.    Yes.

Q.    * * * Do you remember did you mean the Monday right prior to the event, the way it's worded?

A.    She had been - - I don't remember when she told me she wanted to move, but it was in that time period.

The Court:  What time period?

The witness:  Probably a week or two weeks prior [to her murder].

* * *

Q.    Two and a half years ago, you used the word "Monday."

A.    Yes.

Q.    Is that what it says?

A.    Yes.

Q.    By context, does it seem like you might have meant possibly the Monday before that but within that close time frame of you finding her on the Sunday?

A.    Yes.

* * *

A.    She told me at one time she feared for her life.

Q.      What was her demeanor like when she was telling you that?

A.      She seemed to be scared.

*Tr.* pp. 332-338.

By the prosecution.

Q.      You said there were, like, three girls that's been coming around taunting her, yelling at her when she is at her apartment, telling her to come out, they wanted to fight her.

A.      Um-hum.

Q.      Is that what she told you?

A.      Um-hum.

Q.      When did she tell you that? And I don't want you to guess.  If you don't know when she told you that, then you don't know.

A.      I don't know exactly when she told me that.

*Id*. at 343.

**{¶49}** The prosecution asked Mr. Hoam whether Deanna was scared or crying whenever she told him about the three girls.  *Id*., at 344.  He responded that she was not crying but seemed "extremely concerned" and felt "unsafe."  *Id*.  When she made the statement, she was not yelling or talking fast but her tone of voice indicated to him that she was very concerned.  *Id*., at 345.  The prosecution asked again, "And did she tell you *when* this event with the three girls occurred?  I don't want you guessing."  *Id*. (emphasis added).  Mr. Hoam replied, "No." *Id.*

Q.      You don't know?

A.      I don't remember.  I don't remember.

Q.	Okay. So your answer is you don't know when this situation with the three girls - - what time period she was referring to when she was telling you that.  Is that correct?

A.	I'm not sure.  I'm not sure of the time, what day it was or exactly when it was.

* * *

Q.	The conversation where she said that she feared for her life, do you recall when you had that phone conversation?

A.	It was shortly before she was murdered.

Q.	Okay.

A.	I don't remember what day it was.

Q:	Okay.

A.	It was shortly before she was murdered.  * * *

Q.	Did she tell you why she feared for her life?

A.	No, she didn't.

Q.	You have no idea why she feared for her life?

A.	She didn't tell me and I didn't know.

Q.	Not only do you not know why she feared for her life, you don't have any time frame on whatever it was that could have caused that fear?

A.	Right.

Q.	It could have been two years ago?  You don't know?

A.	I don't know.

By the Court:

Q.     My question briefly: I guess when she told you she feared for her life, was that a separate conversation that you had with her? Was that separate from this talk of the three girls?

A.     Yes.

Q.     All right. And the talk of - - and she never told you why she said that? She just said I fear for my life, but you don't know why she - - she didn't explain to you what had happened to explain why she said that?

A.     Correct.

*Tr.*, at pp. 346-348.

**{¶50}** After the proffer, the trial court held that the testimony was not admissible under Evid.R.803(2), the excited utterance exception to the hearsay rule. The court stated "he can't tell us what that time period is. He can't say if it was five minutes, ten minutes, three days, two weeks. It doesn't fit. You have to be able to say it was in a time frame that she was still under the stress, so she has to be like, oh, my God. It doesn't fit." *Tr.*, p. 352.

**{¶51}** Upon review of the proffered testimony, we conclude the trial court did not abuse its discretion in excluding Deanna's statements to Mr. Hoam. When the court itself asked Mr. Hoam whether her statement that she feared for her life was a separate conversation from her statements about the three women, he replied yes, meaning it was separate and distinct. Mr. Hoam was clear he did not know why she feared for her life, she just made that statement at some point. Indeed, when Mr. Hoam was pressed about the exact time frame Deanna told him she feared for her life, he could not definitively

answer.  As set forth, an excited utterance must be spontaneous and unreflective and clearly relate to a startling event.

{¶52}  Moreover, Mr. Hoam's testimony does not clearly demonstrate that Deanna observed the women damaging her car.  Mr. Hoam recalled she told him about the incident during a phone conversation, but there is no indication Deanna was "under the stress" of the startling event.  Simply stated, Appellant did not establish a sufficient connection or timeline between the three women's alleged conduct and the victim's utterance that she feared for her life. The trial court thoughtfully listened to the proffered testimony, asked its own clarifying questions, and carefully analyzed the issue.  As a result, we cannot conclude the trial court abused its discretion in excluding the statements.  **Appellant's fourth assignment of error is overruled**.

## CONCLUSION

**{¶53}** For the reasons set forth in this Opinion, Appellant's first, second, third, and fourth assignments of error are overruled in their entirety. The jury verdict and judgment from the Richland County Court of Common Pleas is affirmed.

**{¶54}** Costs to Appellant.

By: Montgomery, J.

King, P.J. and

Popham, J. concur.