DECISION.
{¶ 1} Defendant-appellant Demecus Hughes appeals from his convictions following a jury trial for aggravated murder, murder, and aggravated robbery[1] in connection with the shooting death of Thomas Maddox. Hughes raises five assignments of error on appeal. In his first and second assignments of error, he challenges his convictions on both the sufficiency and the weight of the evidence. In his third and fourth assignments of error, Hughes challenges the trial court's ruling on his motion to suppress his statement to police and the identification testimony of two witnesses. In his fifth assignment of error, he contends that an assistant prosecutor's comments during closing argument denigrated defense counsel and denied him a fair trial. Because we find none of the assignments meritorious, we affirm the judgment of the trial court.
I. State's Evidence of the Shooting
 {¶ 2} During Hughes's trial, the state presented the following evidence: around 3:00 p.m. on June 28, 2003, Maddox finished cutting grass for Anthony Bowling's lawncare business. Bowling then drove Maddox to his apartment on Sutter Avenue, where he paid Maddox $165 in cash. Maddox put the money in his pants pocket. When Bowling left the area, Maddox was standing outside his apartment complex and talking with a group of people.
 {¶ 3} Jermaine Austin, a drug dealer, testified that he saw Maddox get off the bus on Sutter Avenue. Maddox told Austin, who was standing near the local grocery store, that he was going to cash his paycheck and buy a phone card. Shortly thereafter, Maddox came to the side of the store and bought marijuana from Austin. During the marijuana buy, Austin testified, he was startled by Hughes, who had walked up behind Maddox and was intently watching the transaction. After the transaction was completed, Austin testified, he saw Maddox walk toward the Marquette Manor apartment complex, with Hughes and Rodrick Reeves following close behind. Austin then saw Hughes and Reeves wrestling with Maddox and trying to get his money. Austin heard a popping sound, but did not learn until later that Maddox had been shot.
 {¶ 4} Helen Ford, who lived in an apartment on Sutter Avenue, also witnessed Maddox's shooting. During her testimony, Ford wore a baseball cap, which she repeatedly pulled down over her face. She stated several times that she was afraid to testify for fear that something would happen to her. Ford testified that from her apartment window she saw Hughes and Reeves follow Maddox into the grocery store and then follow him outside. Once they were outside, Ford saw Hughes and Reeves wrestling with Maddox, and trying to take something from him. When Maddox resisted, Ford saw Reeves shoot him. Ford testified that she called for emergency assistance and later spoke with police about the shooting.
 {¶ 5} Abrilla Jacobs, who lived in an apartment across the street from Ford, was also looking out her apartment window when the shooting occurred. Jacobs testified that she saw Hughes and Reeves confront Maddox. Then she heard a gunshot. She saw Maddox, who was struggling with Reeves, fall to the ground, and Reeves and Hughes go through his pockets. Hughes then walked away quickly, while Reeves, who was holding a gun and a paper bag, ran in a different direction. Jacobs called for emergency assistance and then went outside to where Maddox was lying. She spoke with police a few days later. Jacobs testified that she no longer lived on Sutter Avenue.
 {¶ 6} Kimberly Boatwright testified that she was standing outside her apartment building on Sutter Avenue talking with a friend when she heard some popping sounds and saw Maddox running from the store towards the Marquette Manor apartment complex, with Hughes and Reeves close behind. She saw Maddox fall to the ground. Reeves then stood over him and shot him. Hughes was standing just behind Reeves. She then saw Hughes reach into Maddox's back pocket. Both men then fled from the scene.
 {¶ 7} When police arrived at the scene, they saw Maddox lying on the sidewalk surrounded by a group of people. They secured the scene, while medical personnel rushed Maddox to the hospital. Maddox was pronounced dead upon arrival. Shortly thereafter, police recovered Maddox's personal effects from the hospital, which included an identification card, a watch, some keys, a small bag of marijuana, and a social security card. An autopsy performed by the deputy coroner revealed that Maddox had two gunshot wounds and several abrasions. One gunshot wound had gone through Maddox's arm, exited, and went back into his chest, causing him to die within seconds to minutes after receiving the wound. The other gunshot wound entered Maddox's upper back and then exited above the ridge of his collarbone. The deputy coroner also found scrapes on Maddox's knuckles, his left elbow, and his buttocks, as well as gun powder residue on his arm. The deputy coroner concluded that Maddox had died of a "hemothorax, which means bleeding into the chest due to gunshot wounds to the torso with perforation of the aorta and lungs."
 {¶ 8} Back at the crime scene, police found a red shirt that had belonged to Maddox, a white towel, a $10 phone card, a glass vial, two quarters, which were lying next to the phone card, a shell casing in the grassy area between the street and the sidewalk, and a Swisher sweet cigar. Criminalist William Schrand examined the spent shell casing that was found at the scene as well as the bullet removed from Maddox's body. Based on his examination, Schrand concluded that the casing found at the scene was a .22-caliber long-rim-fire cartridge case with a semicircular fire pin impression. Schrand also concluded that the bullet that had been removed from Maddox's body was a.22 long-rifle hollow-point bullet. Schrand informed police that the murder weapon, which had not been recovered, was most likely a .22 long-rifle-chambered semiautomatic pistol made by Jennings or Bryco.
 {¶ 9} In addition to collecting physical evidence, the police were able to speak with a number of people at the scene. The following day they obtained a taped statement from Boatwright in which she identified Maddox's assailants as Mecus and Little Roj or Roger. The police also obtained statements from Austin, Ford, and Jacobs. On July 3, Boatwright gave a second taped statement to police. Both Boatwright and Austin identified Hughes from a photographic array.
 {¶ 10} On July 10, Hughes's father brought him to the District One police station. Hughes was then placed into custody and transported to police headquarters on Broadway Street. After answering some preliminary questions and signing a waiver of his Miranda rights, Hughes was questioned about Maddox's murder. Hughes told police that he had been playing basketball with a group of friends on the basketball courts across from the store that afternoon when he heard a gunshot. Hughes said he was running towards the area of the gunshot when he heard a second gunshot. As he approached, he saw Maddox with his left hand partially around Reeves's neck and his right hand down to his side. As he came closer, he observed a brown gun lying on the ground and Maddox gasping for breath. When he asked Reeves what was going on, Reeves did not answer; he just started walking away, crying. Hughes then walked with Reeves across the street, leaving Maddox lying on the sidewalk. Hughes told police that he did not see Reeves with the gun and that he did not know how Maddox had been shot.
 {¶ 11} Hughes was subsequently indicted for aggravated murder, murder, and aggravated robbery in connection with Maddox's death. Each charge was accompanied by gun specifications. Hughes pleaded not guilty. Prior to trial, Hughes filed a motion to suppress Boatwright and Austin's pretrial identifications as well as his statement to police. The trial court denied the motion after a hearing. A jury found Hughes guilty of aggravated murder, murder, and aggravated robbery, as well as the accompanying gun specifications. The trial court sentenced Hughes to twenty years to life on the merged aggravated-murder and murder charges, to seven years for the aggravated robbery, and to three years on the merged gun specifications, with the sentences to be served consecutively.
II. Sufficiency of the Evidence
 {¶ 12} We begin by addressing the second of Hughes's assignments of error, in which he argues that his convictions for aggravated murder, murder, and aggravated robbery were not supported by sufficient evidence.
 {¶ 13} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime proven beyond a reasonable doubt."[2]
 {¶ 14} During the trial, the state's theory of the case was that Hughes had acted in concert with Reeves and was guilty as an accomplice to the crimes. As an accomplice, Hughes "could be held criminally liable as if [he] was the principal offender and was criminally culpable to the same degree as the principal offender."[3] The Ohio Supreme Court has held that when the state pursues a conviction under a complicity theory of aiding and abetting, it "must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal."[4] Furthermore, "[s]uch intent may be inferred from the circumstances surrounding the crime."[5]
 {¶ 15} Hughes claims that the state failed to show that he aided and abetted Reeves in the robbery and murder of Maddox. Rather, he contends the sole basis for his convictions was his alleged presence at the scene of the crimes. We disagree. Bowling testified that he had paid Maddox $165 in cash on the day he was murdered. Austin testified that Maddox had told him that he was going to cash a check in the store and buy some items, before purchasing some marijuana from him. Ford, who was watching from her window, saw Hughes and Reeves follow Maddox into the store. Shortly thereafter, Maddox came to the side of the store and bought some marijuana from Austin. During the marijuana buy, Austin testified, he was startled by Hughes, who had walked up behind Maddox and was intently watching the transaction. Austin testified that Hughes and Reeves then chased Maddox and struggled with him. Austin then heard a popping sound. Boatwright testified that after she heard the popping sound, she saw Hughes and Reeves chasing Maddox. Boatwright testified that Maddox then fell to the ground and struggled with Reeves and Hughes. Boatwright, Jacobs, and Ford each testified that they saw Reeves shoot Maddox and then saw Hughes and/or Reeves go through Maddox's pockets. Their testimony was consistent with the deputy coroner, who testified that Maddox had multiple abrasions on his body and two gunshot wounds, one of which had resulted in his death. The deputy coroner further testified that gunshot residue on Maddox's arm indicated that he had been shot at close range. All of this testimony, when viewed in the light most favorable to the prosecution, was sufficient to show that Hughes was not a mere bystander to Maddox's robbery and murder, but that he aided and abetted Reeves in the commission of the offenses.[6] Consequently, we overrule his second assignment of error.
III. Manifest Weight of the Evidence
 {¶ 16} We next address Hughes's first assignment of error, in which he contends his convictions were against the manifest weight of the evidence.
 {¶ 17} In determining whether a conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice such that the conviction must be reversed and a new trial ordered.[7] "Weight of the evidence concerns `the inclination of the greater amount of credibleevidence, offered in a trial, to support one side of the issue rather than the other.'"[8] In making this determination, the appellate court is not required to view the evidence in the light most favorable to the prosecution, but may consider and weigh all the evidence produced at trial.[9]
 {¶ 18} Hughes contends his convictions were against the manifest weight of the evidence because the state's witnesses presented inconsistent testimony regarding the shooting. Hughes argues that Boatwright was the only witness who testified that he helped Reeves to rob Maddox. He contends that Boatwright's testimony was not credible given her prior testimony that Reeves, not Hughes, had reached into Maddox's pocket and taken his wallet, and given her animosity towards him from a prior altercation with her family. Hughes further contends that Ford, Austin, and Jacob's testimony was also suspect. He emphasizes differences in their testimony and contends that each witness had a motivation to lie about his involvement in the shooting.
 {¶ 19} Because the state had no physical evidence linking Hughes to the crimes, it relied solely on the eyewitness testimony of Austin, Ford, Boatwright, and Jacobs. Boatwright gave two statements to police after the shooting and testified several times prior to Hughes's trial. Ford and Austin also gave statements to police. Jacobs had also spoken with police and testified at Reeves's trial. The record reveals that defense counsel cross-examined each of these witnesses at length about their prior statements to police and their prior trial testimony. Moreover, defense counsel painstakingly highlighted the inconsistencies among the state's witnesses during his closing argument. Because the jury had the opportunity to observe the demeanor of the state's witnesses, to weigh their credibility, and to resolve any inconsistencies in their testimony, we cannot say that Hughes's convictions were against the manifest weight of the evidence. We, therefore, overrule his second assignment of error.
IV. Miranda and the Right to Counsel
 {¶ 20} In his third assignment of error, Hughes contends the trial court erred in overruling his motion to suppress his statements to police. Hughes contends that his age, lack of education, and questionable sobriety cast doubt on whether his waiver of his constitutional rights was knowing and voluntary. Hughes also contends that his Sixth Amendment rights were violated when police ignored his request for an attorney during questioning.
 {¶ 21} In determining whether a defendant's pretrial statement is voluntary, courts "should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."[10] The Ohio Supreme Court has consistently held that evidence of police coercion is necessary to render involuntary a defendant's waiver of Miranda rights.[11]
 {¶ 22} Based upon our review of the record, we conclude that Hughes was properly informed of his Miranda rights and that he knowingly, voluntarily, and intelligently waived those rights. Detective Robert Heinlein was the only witness who testified at the suppression hearing about Hughes's statements to police. Heinlein testified that Hughes's father had seen him on a Crimestoppers television program and brought Hughes to District One for questioning on July 10. Heinlein testified that he began the interview by asking Hughes some preliminary questions. Hughes told Heinlein that he had a ninth-grade education and that he had been drinking one and a half to two hours prior to seeing his father. Heinlein testified, however, that he did not believe Hughes was intoxicated during the interview. Heinlein then read Hughes his Miranda
rights, line by line, from a notification-of-rights form. After Heinlein felt confident that Hughes understood his rights, he had Hughes sign his name at the bottom of the form. Heinlein then interviewed Hughes for a half-hour to forty-five minutes. During the interview, Hughes told Heinlein that he wanted to tell his side of the story, but that he did not want to give a taped statement. Heinlein further testified that he made no promises or threats to Hughes, and that at no point in time did Hughes assert either his right to remain silent or his right to counsel. Because the totality of the circumstances surrounding Hughes's interrogation did not support Hughes's contention that the waiver of hisMiranda rights was involuntary or unknowing, we cannot say the trial court erred in failing to suppress his statements to police.
 {¶ 23} Nor can we say that Hughes's Sixth Amendment right to counsel was violated during the interrogation. During the suppression hearing, Hughes's counsel questioned Heinlein about a statement he had written in his notes from the interrogation. Heinlein admitted that he had written the following statement from Hughes: "I'll just talk when my lawyer gets here." But Heinlein stated that he did not believe this to be a formal request by Hughes for an attorney. On re-direct, Heinlein testified that Hughes had never asked for an attorney during the interrogation, nor had Hughes refused to answer questions because he was waiting for an attorney to arrive.
 {¶ 24} In Edwards v. Arizona, the United States Supreme Court held that if a suspect requests counsel at any time during a police interview, the police must cease their questioning until an attorney is made available or until the suspect himself initiates further conversation.[12] In a subsequent decision, Davis v. United States,[13]
the Supreme Court declined to "require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney."[14] Rather, the Davis court held that "the suspect must unambiguously request counsel. * * * He must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."[15] The Davis court further explained that "[i]f the [suspect's] statement fails to meet the requisite level of clarity, Edwards does not require that the officers stop questioning the suspect."[16]
 {¶ 25} Having reviewed the record, we cannot conclude that the detective's handwritten note reflected an unambiguous request by Hughes for an attorney. Detective Heinlein, who was the only witness to testify regarding Hughes's statements, stated that he did not believe that Hughes's comment was a request for an attorney. The trial court, sitting as the trier of fact, was in the best position to assess the detective's credibility. Furthermore, even if we were to assume that Hughes's comment was an invocation of his right to counsel, we would have difficulty determining on the state of this record what statements would need to be suppressed. There is no discussion in the record regarding what evidence, if any, flowed from Hughes's statements. Consequently, we cannot say that the trial court erred in failing to suppress Hughes's statements to police. We, therefore, overrule his third assignment of error.
V. Identification Testimony
 {¶ 26} In his fourth assignment of error, Hughes contends the trial court erred in failing to suppress the identification testimony of two witnesses at trial, because their identifications resulted from unduly suggestive lineups. Hughes claims that his photograph stood out from the rest in the array because he was the only individual who had a "cornrow" hairstyle and because he was the only one whose head was cocked to one side.
 {¶ 27} In State v. Taylor, this court explained that "[i]n order to suppress identification evidence, a defendant has the burden to show that the identification procedure was unnecessarily suggestive."[17] We stated that "[i]f the defendant meets this burden, the court must consider whether the procedure was so unduly suggestive as to give rise to a substantial likelihood of irreparable misidentification."[18]
Thus, "[e]ven if the procedure was suggestive, the challenged identification evidence is admissible at trial as long as it is reliable."[19] In Taylor, we rejected a defendant's claim that a photographic array was unnecessarily suggestive because he was not surrounded by "people nearly identical in appearance" to him.[20]
 {¶ 28} We have reviewed the photographic array in this case, which included Hughes's photograph, and we cannot say that it was unnecessarily suggestive. The array consisted of six Polaroid photographs. All of the individuals in the photographs were African-American men around age 20 with short hair. It is not apparent from the photographs that Hughes was wearing cornrows because four of the six photographs, including Hughes's photograph, have a black background. Furthermore, while we agree that Hughes's head was tilted in his photograph, one of the other individuals in the same array also had his head tilted. Thus, we fail to see how that fact alone rendered the array impermissibly suggestive.[21] Because Hughes failed to demonstrate that the photographic array was unnecessarily suggestive, we overrule his fourth assignment of error.
VI. Prosecutorial Misconduct
 {¶ 29} In his fifth assignment of error, Hughes contends that the assistant prosecutor engaged in misconduct during the rebuttal portion of closing argument when he referred to defense counsel as a liar. Hughes contends that the assistant prosecutor's remarks improperly denigrated defense counsel. Hughes acknowledges, however, that his failure to object below has waived all but plain error.[22] Thus, in order for Hughes to prevail, he must show that the outcome of the trial clearly would have been different but for the alleged error.[23]
 {¶ 30} Our review of the record reveals that the assistant prosecutor's remarks were in direct response to defense counsel's closing argument. In his closing argument, defense counsel had recounted the testimony of the state's four eyewitnesses in great detail, highlighting inconsistencies in their testimony and questioning their credibility. For example, defense counsel referred to Boatwright as "Kim-I-made-a-mistake Boatwright" and then highlighted discrepancies in her testimony. Defense counsel then told the jury that Boatwright was a liar because of these discrepancies. Defense counsel similarly pointed out discrepancies in Ford's and Austin's testimony and likewise referred to them as liars.
 {¶ 31} In his rebuttal, the assistant prosecutor made the point that discrepancies in eyewitness testimony were to be expected, as everyone viewed traumatic events with their own individual perceptions and from different vantage points. To illustrate this point, he referred to a trivial mistake that defense counsel had made and then corrected by misspelling a word on an easel displayed to the jury. The assistant prosecutor pointed out that defense counsel, in fact, had made a mistake by misspelling a word, and that under his argument he would be a liar. The assistant prosecutor, however, quickly pointed out that defense counsel was not a liar. Rather, he had just made a simple mistake. The assistant prosecutor was simply illustrating the absurdity of defense counsel's argument. Exposing weaknesses in defense counsel's theory of the case was within the reasonable bounds of advocacy. Consequently, we cannot say that the prosecutor's comments rose to the level of misconduct. We, therefore, overrule Hughes's fifth assignment of error. Having found no merit to Hughes's five assignments of error, we, therefore, affirm the judgment of the trial court.
Judgment affirmed.
Doan, P.J., Painter and Sundermann, JJ.
[1] Each charge was accompanied by gun specifications. The jury also found Hughes guilty of the gun specifications.
[2] State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[3] State v. Terrell, 1st Dist. No. C-020194, 2003-Ohio-3044, at ¶ 10; State v. McKibbon, 1st Dist. No. C-010145, 2002-Ohio-2041.
[4] State v. Johnson, 93 Ohio St.3d 240, 2001-Ohio-1336, 754 N.E.2d 796, syllabus.
[5] Id.
[6] See State v. Palmer, 80 Ohio St.3d 543, 1997-Ohio-312,687 N.E.2d 685; State v. Davis, 76 Ohio St.3d 107, 1996-Ohio-414,666 N.E.2d 1099.
[7] State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541.
[8] Id.
[9] Id. at 390.
[10] State v. Edwards (1976), 49 Ohio St.2d 31, 358 N.E.2d 1051, paragraph two of the syllabus.
[11] State v. Hill, 64 Ohio St.3d 313, 318, 1992-Ohio-43, 595 N.E.2d 884;State v. Cooey (1989), 46 Ohio St.3d 20, 28, 544 N.E.2d 895.
[12] (1981), 451 U.S. 477, 484-485, 101 S.Ct. 1880.
[13] (1994), 512 U.S. 452, 114 S.Ct. 2350.
[14] Id. at 459.
[15] Id.
[16] Id.
[17] 1st Dist. No. C-020475, 2004-Ohio-1494, at ¶ 10.
[18] Id.
[19] Id.
[20] Id. at ¶¶ 13-17.
[21] See State v. Page, 8th Dist. No. 84341, 2005-Ohio-1493, at ¶ 18.
[22] State v. Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus.
[23] State v. D'Ambrosio, 73 Ohio St.3d 141, 143-144, 1995-Ohio-129,652 N.E.2d 710.