[Cite as *State v. Hughes*, 2026-Ohio-545.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO.   C-250021 |
| | | TRIAL NO.     B-0205915-B |
|     Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *JUDGMENT ENTRY* |
| DEMECUS HUGHES, | : | |
|     Defendant-Appellant. | : | |

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 2/18/2026 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *State v. Hughes*, 2026-Ohio-545.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. | C-250021 |
| | | TRIAL NO. | B-0205915-B |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| | | *JUDGMENT ENTRY* | |
| DEMECUS HUGHES, | : | | |
| Defendant-Appellant. | : | | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: February 18, 2026

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *John D. Hill, Jr.,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Demecus Hughes*, pro se.

**CROUSE, Presiding Judge.**

**{¶1}** In 2003, defendant-appellant Demecus Hughes was convicted for complicity in a robbery that escalated into murder. Twenty years later, Hughes applied for DNA testing of various items found on or around the victim. He argues that such testing will exclude him as a suspect and corroborate an affidavit in which his former codefendant, the shooter, identified someone else as his accomplice. The trial court denied Hughes's application because the testing would not be "outcome determinative." After considering the trial record and surrounding facts, we affirm.

## I. BACKGROUND

### A. *Original Proceedings*

**{¶2}** In June 2002, T.M. was shot twice outside an apartment building. T.M. died from his wounds. The State charged Rodrick Reeves with shooting T.M. and charged Hughes under a complicity theory. Specifically, the indictment charged Hughes with one count of aggravated murder, one count of murder, and one count of aggravated robbery. Descriptions of Hughes's trial and the evidence against him can be found in *State v. Hughes*, 2005-Ohio-2453, ¶ 2-11 (1st Dist.) ("*Hughes I*").[1] We reiterate many of the relevant facts below, adding information from the record where it is salient to this appeal.

1.

**{¶3}** At trial, the State's primary evidence of Hughes's guilt was the testimony of four eyewitnesses.

**{¶4}** The first, Kimberly Boatwright, was a resident of the apartment building

---

[1] We note that our prior opinion in Hughes's direct appeal incorrectly indicated that the shooting took place "on June 28, 2003," instead of June 28, 2002, as alleged in the indictment. *Hughes I*, 2005-Ohio-2453, at ¶ 2 (1st Dist.). This was a typographical error.

and had been outside when the shooting occurred. *See Hughes I* at ¶ 6. She was familiar with the faces and, to a lesser extent, the nicknames of both Hughes and Reeves, and she had prior run-ins with the pair (although the nature of those encounters was contested).

{¶5} Boatwright testified that she had been drinking on the day of the incident, though not to excess. She told the jury that, on the day of the shooting, she saw "two young guys behind" T.M., who were trying to rob him. T.M. ran and fell, at which point one of the two men, whom she identified as Reeves, stood "over top of [T.M.] and shot him." Boatwright testified that the other man, whom she identified as Hughes, was close by and did nothing to stop Reeves from shooting T.M. She further testified that she saw Hughes going through T.M.'s pockets after T.M. was shot. However, Detective Heinlein later testified that, the day after the shooting, Boatwright had said that Reeves, not Hughes, had taken a billfold from T.M.'s pocket.

{¶6} The second witness was a drug dealer named Jermaine Austin. *See Hughes I*, 2005-Ohio-2453, at ¶ 3 (1st Dist.). Austin testified that he was familiar with both Reeves and Hughes from around the neighborhood, and he identified Hughes in open court. He told the jury that, just before the shooting, T.M. had purchased $10 worth of marijuana from him in the alley next to the apartment complex. During the sale, Austin had turned to find Hughes watching the transaction over Austin's shoulder. Austin testified that Hughes followed T.M. as he departed from the transaction, and that the two were joined by Reeves shortly thereafter. Reeves and Hughes began to wrestle T.M., attempting to take his money. Austin heard a "pop," after which he ran to the basketball court across the street.

{¶7} On cross-examination, defense counsel impeached Austin with his prior statements, in which Austin had suggested that he had not seen Hughes again after

the drug transaction.

{¶8} The third and fourth eyewitnesses, Helen Ford and Abrilla Jacobs, both lived near the apartment complex at the time of the shooting. Both testified that they recognized Hughes from seeing him around the area on prior occasions.

{¶9} Ford, who appeared to have known Hughes's name prior to the shooting, testified that she had seen Reeves and Hughes follow T.M. into a store. *See Hughes I*, 2005-Ohio-2453, at ¶ 4 (1st Dist.). When they came out, Ford saw Hughes and Reeves wrestling with T.M. and trying to take something from him, until one of the two assailants shot him. Ford testified that no one other than Reeves and Hughes had been involved in the shooting.

{¶10} Jacobs testified that she had been by a window in her home when the incident occurred. *See Hughes I* at ¶ 5. She first saw Reeves, Hughes, and T.M. talking. Then she saw Reeves grapple with T.M. Jacobs's testimony was unclear as to whether Hughes also joined the fray. As the fight progressed, Jacobs "heard a gunshot go off" and saw T.M. fall to the ground. Hughes and Reeves then ran off in slightly different directions. Jacobs described Reeves carrying a paper bag that had come from T.M., although she was unsure how it had gotten from T.M. to Reeves. Jacobs initially testified that she had seen both Reeves and Hughes go through T.M.'s pockets after T.M. was shot, but she later said that Reeves alone had searched T.M.'s body and that Hughes had not.

{¶11} Several days after the shooting, police showed Jacobs a photo of Hughes. Jacobs told them that Hughes "look[ed] like the guy with" Reeves, but that she was "not sure [Hughes] was with [Reeves] at the time of the shooting." Jacobs later identified Hughes in open court as the individual she had seen with Reeves.

2.

**{¶12}** Detective Heinlein testified that, when Hughes turned himself in, he gave a statement to the police. *See Hughes I*, 2005-Ohio-2453, at ¶ 10 (1st Dist.). Because the police had acquiesced in Hughes's request not to record this statement, Detective Heinlein had to use his notes to relay its substance to the jury. The details of that story formed the basis of Hughes's counter-narrative at trial.

**{¶13}** Hughes told Detective Heinlein that he had been "down at the basketball courts with a bunch of friends" when he "heard a commotion" and a single gunshot. Hughes told Heinlein that he ran toward the commotion, where he saw T.M. and Reeves falling to the ground and a brown gun lying nearby. Hughes said that Reeves's hand was partially around T.M.'s neck and that T.M. was gasping for breath. Hughes asked Reeves what had happened, but Reeves simply walked away across the street, crying. Hughes followed.

**{¶14}** Hughes also told Detective Heinlein that there would be numerous witnesses at the basketball court who could vouch for his story. However, Detective Heinlein said that the police never located these witnesses, and none testified at trial.

3.

**{¶15}** At closing arguments, Hughes's attorney highlighted inconsistencies in and among the eyewitnesses' testimony, and he emphasized that there was "no physical evidence whatsoever tying Demecus Hughes to this crime." Defense counsel pointed to Hughes's statement to the police, in which Hughes was "admitting he's there, but [saying] he comes after the second shooting." Counsel asked the jury, "Why would he lie about that? Why? He's saying he's there." Ultimately, defense counsel argued that the credible evidence showed, at most, that Hughes had been nearby during the shooting and had failed to provide T.M. aid.

6

{¶16} The jury found Hughes guilty on all three counts and firearms specifications. The trial court merged the murder count into the aggravated-murder count and sentenced Hughes to a cumulative 30 years to life in prison. We affirmed. *Hughes I*, 2005-Ohio-2453, at ¶ 1, 31 (1st Dist.).

### B. Postconviction DNA-Testing Application(s)

{¶17} On April 27, 2023, Hughes filed an "Application for DNA Testing" requesting an inventory of any biological evidence retained in his case. The trial court initially denied this request under the Ohio Public Records Act in September 2023, but amended that entry two weeks later to deny the application under Ohio's postconviction DNA-testing statute.

{¶18} On November 13, 2023, Hughes filed another application for postconviction DNA testing. This time, he requested testing of 13 items, including T.M.'s "pants and pockets," .22-caliber cartridge casings found at the scene of the shooting, scrapings from T.M.'s fingernails, and assorted everyday items found on or around T.M.'s body.

{¶19} Hughes argued that advances in DNA testing, including advances in the testing of "touch DNA," would now allow forensic analysts to derive meaningful DNA profiles from these items in a manner previously impossible. Hughes attached to his application a 2010 affidavit, in which the shooter, Reeves, averred as follows:

> Demecus Hughes has been wrongly convicted for a crime that I
> committed with Michael McCoy. Demecus Hughes was nowhere near
> the scene when we killed [T.M.]. I didn't originally say anything about
> any aspect of the killing of [T.M.] on the advice of my counsel.

{¶20} The trial court denied the November 13 application on December 23, 2024. It reasoned that Hughes "was convicted under a complicity theory," and that the

7

evidence against him "consisted mainly of eye-witness testimony identifying him as a participant." The trial court therefore concluded that Hughes had "failed to demonstrate how his exclusion as the source of any DNA would be outcome determinative or preclude him as a suspect," and that the Reeves affidavit had done "nothing to change this result."

## II. ANALYSIS

{¶21} Hughes now appeals the denial of his application, listing five assignments of error. In the first, he contends the trial court failed to follow procedural requirements in R.C. 2953.73(D). In the remaining four, Hughes contests the trial court's application of the substantive criteria in R.C. 2953.74(B) and (C).

{¶22} We review the denial of an application for DNA testing under R.C. 2953.73 for an abuse of discretion. *State v. Johnson*, 2024-Ohio-5074, ¶ 9 (1st Dist.).

### A. First Assignment of Error:
### Failure to Consider Entire Record under R.C. 2953.73(D)

{¶23} Hughes's first assignment of error alleges that the trial court procedurally erred by denying his November 2023 application without considering all relevant papers, submissions, and record documents as required by R.C. 2953.73(D). His argument focuses on an application for DNA testing he claims to have submitted on October 4, 2023, but which the trial court never docketed.

{¶24} To the extent Hughes argues that the trial court erred by denying his November 13 application without considering the evidence or arguments contained in his October 4 application, we have no means of assessing his argument. The October 4 application is not part of the trial-court record on appeal.[2] We therefore cannot know

---

[2] Hughes moved this court to take judicial notice of the October 4, 2023 application in his "Motion for the Appellate Court to Take Judicial Notice as Adjudicative Facts Not Subject to Dispute

whether it contained evidence which the trial court ought to have considered in denying the November application.

**{¶25}** To the extent Hughes suggests that the trial court's failure to docket or rule on his October 4 application was *itself* reversible error, that issue is plainly beyond the scope of R.C. 2953.73(D). And, in any event, if the October 4 application was never docketed or ruled upon, then there can be no final order on the October 4 application to review on appeal. Any relief this court could provide for a failure to rule would be by way of extraordinary writ, not appeal. *Compare, e.g., State ex rel. Rodak v. Betleski*, 2004-Ohio-6567, ¶ 19-20 (granting procedendo where trial court unnecessarily delayed ruling on postconviction petition); *Cherol v. Sieben Invests.*, 2006-Ohio-7048, ¶ 17 (7th Dist.) (holding that failure to rule on Civ.R. 60(B) motion could not be considered on appeal and that procedendo was the appropriate remedy).

**{¶26}** Finally, to the extent Hughes's first assignment of error argues that the failure to docket his October application led the trial court to deny his November application as successive, we disagree. The trial court's December 23 entry did not purport to deny Hughes's application on the ground that it was second, successive, or res judicata, and the State has not argued that we should affirm on that ground.

**{¶27}** Hughes's first assignment of error is therefore overruled.

### B. Second, Third, Fourth & Fifth Assignments of Error: Substantive Criteria & "Outcome Determinative" Analysis

**{¶28}** Hughes's remaining assignments of error attack the trial court's application of the substantive DNA-testing criteria. A trial court may accept a postconviction DNA-testing application filed pursuant to R.C. 2954.73 only if one of

---

Pursuant to Ohio Evidence Rule 201," filed April 8, 2025. We denied that motion in an entry dated May 1, 2025, explaining that "[t]o the extent the materials appellant wishes the Court to take judicial notice of are part of the trial court record, they will already be before the Court," and "[t]o the extent the materials are not part of the trial court record, they cannot now be added."

9

the criteria in R.C. 2953.74(B) and all six criteria in R.C. 2953.74(C) are met.

{¶29} Hughes's second assignment of error broadly challenges the trial court's application of these substantive standards, contending that the "trial court erred when it failed to grant Hughes's November 13th, 2023 application for DNA testing pursuant to R.C. 2953.74(B)(1) and 2953.74(C)." His third, fourth, and fifth assignments of error then argue that the trial court erred by denying the application pursuant to individual criteria in R.C. 2953.74(C)(1)-(6). But these latter three assignments of error are subsumed by the second. To prevail below, Hughes needed to show he met all six criteria; if even one was unmet, his application was properly denied. Accordingly, we address Hughes's second through fifth assignments of error together.

1.

{¶30} On appeal, the State argues only that Hughes failed to satisfy the criteria in R.C. 2953.74(C)(4) and (C)(5), which read:

(C) If an eligible offender submits an application for DNA testing under section 2953.73 of the Revised Code, the court may accept the application only if all of the following apply:

. . .

(4) The court determines that one or more of the defense theories asserted by the offender at the trial stage . . . was of such a nature that, if DNA testing is conducted and an exclusion result is obtained, the exclusion result will be outcome determinative.

(5) The court determines that, if DNA testing is conducted and an exclusion result is obtained, the results of the testing will be outcome determinative regarding that offender.

10

**{¶31}** A DNA test produces an "exclusion result" when it "scientifically precludes or forecloses the subject offender as a contributor of biological material recovered from the crime scene or victim in question." R.C. 2953.71(G). And an exclusion result is "outcome determinative" if there is "a strong probability that," had the jury known of the exclusion and analyzed it in light of all available admissible evidence, "no reasonable factfinder would have found the offender guilty." R.C. 2953.71(L). A trial court properly denies a request for DNA testing that would not be outcome determinative. *State v. Buehler*, 2007-Ohio-1246, ¶ 37; *accord Johnson*, 2024-Ohio-5074, at ¶ 9 (1st Dist.).

**{¶32}** The DNA-testing statute further requires that, **"in determining whether the 'outcome determinative' criterion . . . has been satisfied,"** the court "shall consider *all available admissible evidence* related to the subject offender's case," not just the exclusion result and the evidence from the original trial. (Emphasis added.) R.C. 2953.74(D); *see also* R.C. 2953.71(L) (requiring court to analyze exclusion result "in the context of and upon consideration of all available admissible evidence"); R.C. 2953.73(D) (requiring court to consider "the supporting affidavits, and the documentary evidence and, in addition to those materials, . . . all the files and records pertaining to the proceedings against the applicant").

**{¶33}** Hughes and the State offer divergent glosses on this statutory text. But both parties' interpretations run headlong into the Ohio Supreme Court's opinion in *State v. Scott*, 2022-Ohio-4277.

**{¶34}** The State contends that, in determining whether an exclusion result would be outcome determinative under R.C. 2953.71(L), "the presence or absence of any third party's DNA on the items in question is immaterial" and cannot be considered. But the Ohio Supreme Court has said the opposite, directing trial courts

not only to "presume that an 'exclusion result' . . . will be obtained by the" applicant, but also to consider how such an exclusion could bolster other evidence supporting a "theory involving an alternative suspect who could be the contributor" of the tested biological material. *Id.* at ¶ 11.

**{¶35}** Hughes, by contrast, urges us to presume not only that an unknown profile will be present, but that this profile will yield a match when uploaded to CODIS, a national DNA-profile database. But this reading, too, is contrary to *Scott*, which "reject[ed] . . . a bright line rule that every offender who submits an application for postconviction DNA testing is entitled to a presumption that his or her test result will return a CODIS match identifying someone other than the petitioner." *Id.* at ¶ 10. Because R.C. 2953.74(E) permits the trial court to order a CODIS search only after it accepts a testing application, any potential results of a CODIS search cannot be considered as "*available* evidence when the trial court is considering a petitioner's application for testing." (Emphasis in original.) *Scott* at ¶ 9.

**{¶36}** We therefore reject both parties' categorical arguments. Instead, we follow the Supreme Court's lead in *Scott* by (1) presuming that the requested DNA testing will yield an exclusion result from biological material on the requested items, and then (2) considering the significance of that result in the context of all available evidence—including any evidence suggesting an alternative suspect.

2.

**{¶37}** Applying this standard to the record before us, we hold that the trial court did not abuse its discretion when it found that an exclusion from the items Hughes listed in his application would not prove outcome determinative. This is so whether we consider a result excluding Hughes as the contributor of biological material found on (a) the everyday items collected from on and around T.M.'s body,

(b) the spent shell casings and scrapings taken from beneath T.M.'s fingernails, or (c) all the items listed in Hughes's application viewed cumulatively.[3]

*a.*

**{¶38}** Eleven of the thirteen items listed in Hughes's DNA-testing application were found scattered around or on T.M.'s body after the shooting, including (1) T.M.'s "pants and pockets," (2) a white towel, (3) T.M.'s red T-shirt, (4) a phone card, (5) a glass vial, (6) two quarters, (7) a Swisher Sweet brand cigarillo, (8) keys, (9) T.M.'s watch, (10) T.M.'s social security card, and (11) a state-issued identification card. Hughes argues that if tests of biological material on one or more of these items exclude him, there is a strong probability no reasonable factfinder would have convicted him. We disagree for three reasons.

**{¶39}** *First*, the probative value of an exclusion result with respect to any of these 11 items would be very limited, either as evidence that Hughes was not involved in the robbery and murder or as evidence that someone else was.

**{¶40}** A finding that Hughes's DNA was not on any of the 11 items would not have significantly undermined the State's case at trial. Four witnesses identified the two robbers/assailants. The first was Reeves. The second was identified as Hughes. But the evidence was ambiguous as to whether Reeves, the second assailant, or both had searched T.M.'s pockets.

---

[3] We note that the State has neither filed a report stating whether biological material was collected, nor represented that it has "consult[ed] with the testing authority and . . . prepare[d] findings regarding the quantity and quality of the parent sample of the biological material collected." *See* R.C. 2953.75 and 2953.76. Here, the trial court chose to deny Hughes's application on the outcome-determinative prong before requiring such reports—a choice it had the discretion to make. *See Buehler*, 2007-Ohio-1246, at ¶ 36; *State v. Levingston*, 2022-Ohio-3312, ¶ 10 (1st Dist.). So, in order to review the trial court's outcome-determinative findings, we must proceed on the assumption (1) that the State *does possess* the items listed in Hughes's application and (2) that a testable quantity of biological material *is present* on them. *See Buehler* at ¶ 31 (holding that trial court need not determine whether evidence is in State's possession if testing would not be outcome determinative); *Levingston* at ¶ 12-14 (holding that trial court generally must order DNA-evidence report before it can deny application based on unavailability of evidence).

**{¶41}** Further, there are numerous individuals other than the second assailant who might have contributed any trace biological material found on these items. These are everyday items and surfaces, frequently touched or exposed to outside contact. And some testimony suggests that Reeves rummaged through T.M.'s pockets, making him a likely contributor of any unidentified biological material. Thus, a finding excluding Hughes from trace biological material left from touching these objects would not compel an inference that someone other than Hughes had joined Reeves.

**{¶42}** We acknowledge that a result revealing the DNA of an unknown contributor—and not Hughes—on one or more of these 11 items would make it less likely that Hughes was the second assailant and would cast some doubt on some witnesses' testimony. But, given the limitations, uncertainties, and alternative explanations described above, any probative value would be incredibly slight. Such a result, on its own, would be unlikely to tip the scales in any but the weakest case.

**{¶43}** *Second*, the Reeves affidavit and Hughes's alternative-suspect theory are weak and would not be substantially corroborated by an exclusion result. In the affidavit, Reeves avers that McCoy, not Hughes, was the second assailant seen assisting Reeves in the robbery and murder. According to Hughes, any unidentified DNA profile on the items found on or around T.M. could be McCoy's and so would render Hughes's alternative-suspect defense more plausible.

**{¶44}** But Hughes offers no evidence to substantiate his alternative-suspect theory apart from the Reeves affidavit. There is no evidence, for example, that McCoy was a known associate of Reeves or T.M., that McCoy had a history of similar crimes, that McCoy was known to spend time in the area near the apartment complex, or even that McCoy resembled Hughes such that eyewitnesses could plausibly have mistaken the two.

**{¶45}** Hughes's original statement to police also weakens the credibility of the Reeves affidavit. According to Detective Heinlein's trial testimony, Hughes said that upon arriving at the scene after hearing the gunshot, he saw Reeves and T.M. fighting. Hughes never mentioned seeing a second assailant who might have been McCoy. Hughes relied on his statement to Heinlein at trial. Since then, he has neither explained why we should discredit his statement, nor articulated how it can coexist with a scenario in which McCoy's DNA wound up on the items found on or about T.M.'s person.

**{¶46}** Any exclusion result would thus need to substantially corroborate the Reeves affidavit to overcome these weaknesses of Hughes's alternative-suspect theory. But, as already discussed, an unknown DNA profile could easily be attributed to an innocuous contributor or to Reeves, rather than to McCoy. Thus, while an exclusion result would be very slightly probative of McCoy's potential involvement, it would not be nearly probative enough to render Reeves's otherwise-unsupported affidavit credible.

**{¶47}** *Third*, and finally, Hughes's conviction was based upon the testimony of four eyewitnesses to the robbery and shooting.

**{¶48}** There is nothing talismanic about eyewitness testimony; DNA evidence and scientific experiment have long since proven that eyewitnesses can be and sometimes are wrong. *See* 1 Loftus et al., *Eyewitness Testimony: Civil and Criminal*, § 1-2 (7th Ed. 2025); Wise et al.*, An Examination of the Causes and Solutions to Eyewitness Error*, 5 Frontiers in Psychiatry 102 (2014);[4] *see generally* Natl. Research Council, *Identifying the Culprit: Assessing Eyewitness Identification* (2014).[5] Thus,

---

[4] Available at https://doi.org/10.3389/fpsyt.2014.00102.
[5] Available at https://doi.org/10.17226/18891.

15

there can be no hard-and-fast rule that eyewitness testimony forecloses the possibility of an outcome-determinative DNA test. Rather, DNA applications must be assessed on a "a case-by-case basis, based on the unique facts of each case." *Scott*, 2022-Ohio-4277, at ¶ 10. Even in cases, like *Scott* itself, that involve eyewitness testimony.

{¶49} Still, the strength of the eyewitness testimony in this case cuts against Hughes's application. All the State's eyewitnesses were familiar with the area and had seen Hughes's face in the neighborhood prior. Several even knew Hughes by name or nickname. Only one arguably had any reason to lie, and none have since recanted their testimony. Nor has Hughes offered any new evidence that would cast doubt on their credibility.

{¶50} In light of this relatively robust testimony and the weak case for McCoy as an alternative suspect, we hold that the severely limited probative value of a result excluding Hughes as a contributor on any of the 11 listed items would not create a strong probability of a not-guilty verdict. So any such exclusion would not be outcome determinative.

*b.*

{¶51} The remaining pieces of evidence on which Hughes seeks testing are (1) two .22-caliber cartridge casings and (2) "scrapings" taken from under T.M.'s fingernails. Although we agree that these items are more likely to contain biological material from a perpetrator, exclusion results would not be outcome determinative.

{¶52} When a victim of a violent crime has fought back against their attacker, testing the biological material caught beneath their fingernails can provide strong evidence of the assailant's identity. *Compare State v. Ayers*, 2009-Ohio-6096, ¶ 43 (8th Dist.); *State v. Emerick*, 2007-Ohio-1334, ¶ 25 (2d Dist.), *overruled on other grounds by State v. Wilson*, 2024-Ohio-4712 (2d Dist.); *see also State v. Conrad*,

16

2025-Ohio-5499, ¶ 31 (5th Dist.) (holding that conviction was not against the manifest weight of the evidence partly because defendant's DNA matched that found on victim's sweatshirt and under her fingernails). Likewise, trace biological material left on spent shell casings fired in a shooting can help to identify the shooter. *See*, *e.g.*, *State v. Sharpe*, 2023-Ohio-2570, ¶ 71 (7th Dist.) ("The most significant evidence against Appellant was the presence of his DNA on a shell casing found at the scene.").

{¶53} We understand that, unlike the trace biological material left on the everyday items discussed above, biological material left on cartridge casings or under fingernails likely came from T.M.'s attackers. And testimony suggested that Hughes was one of those attackers. Such evidence is therefore on a different footing from the 11 items previously addressed.

{¶54} But Hughes was not the *only* one who fought with T.M.—the four eyewitnesses said that Reeves joined in. Thus, finding an unknown DNA profile under T.M.'s fingernails would be entirely consistent with the witnesses' stories, would provide little corroboration for the Reeves affidavit, and would tell us very little about whether Hughes had been involved. *Compare Buehler*, 2007-Ohio-1246, at ¶ 37 (holding that a test of fingernail scrapings would not be outcome determinative because an exclusion "would be consistent with the state's position at trial, i.e., that [codefendant] was the initial assailant and that [the victim] attempted to defend herself against [codefendant's] initial blows with the hammer after struggling with [defendant]").

{¶55} The cartridge casings are even less helpful. The State's theory has always been that Reeves was the triggerman, not Hughes. Hughes has shown no evidence and urged no theory to the contrary. A result excluding Hughes from biological material on the cartridge casings and identifying an unknown contributor would thus be

entirely consistent with Reeves having loaded the rounds into his own weapon, which he later fired. Nothing about this contradicts the State's complicity theory of Hughes's guilt.

**{¶56}** Thus, we hold that a result excluding Hughes as a contributor to biological material left under T.M.'s fingernails or on the cartridge casings would not be outcome determinative here.

*c.*

**{¶57}** Finally, Hughes argues that viewing the various exclusion results independently is not the end of the story. He contends that we must consider the possibility that several of these samples may contain biological material from the *same* unknown contributor. And that contributor, Hughes suggests, could be McCoy.

**{¶58}** In support of this contention, Hughes points to *Emerick*, 2007-Ohio-1334 (2d Dist.). The defendant in *Emerick*, who had been convicted as the sole perpetrator in a double murder, sought DNA testing of the biological material under the victims' fingernails, on various bloodstains from the bar where the victims were found, and on the murder weapon. *Id.* at ¶ 3, 12, 25. The Second District held that such testing would be outcome determinative, because, if an "unidentified donor's DNA [were] located on different evidentiary items," then the factfinder could infer that this unidentified donor was the real perpetrator. *Id.* at ¶ 25.

**{¶59}** The State counters that Hughes's case is controlled by our opinion in *Johnson*, 2024-Ohio-5074 (1st Dist.). In *Johnson*, witnesses described the defendant as one of three shooters who had fired at the victim, leading to his conviction on a complicity theory. *Id.* at ¶ 3, 15. Fourteen years later, the defendant sought DNA testing of the cartridge casings found at the crime scene. *Id.* at ¶ 4-5. As in *Emerick*, he argued that a repeated, unidentified contributor's profile across several cartridge

casings would suggest that someone else had been responsible for the murder. *Id.* at ¶ 14. We disagreed, distinguishing Johnson's case from *Emerick* on the grounds that (1) the presence of other shooters' DNA on the cartridges, and not Johnson's, would have accorded with the multiple-shooters narrative and with the testimony that others involved in the crossfire had grabbed guns that did not belong to them; and (2) Johnson had been identified by eyewitnesses. *Id.* at ¶ 15-16. We concluded that, even viewed in the aggregate, DNA testing of the casings would not cross the outcome-determinative threshold. *Id.* at ¶ 17.

{¶60} This case is much closer to *Johnson* than *Emerick*. As in *Emerick*, any consistent profile across several items Hughes asked to test—especially if this included the fingernail scrapings—likely came from an individual who attacked and robbed T.M. But, as in *Johnson*, that is not enough. Everyone *admits* there was another perpetrator in this case: Reeves. Hughes has offered no means of excluding Reeves as the contributor of any unidentified DNA. As in *Johnson*, therefore, a DNA test result would be, at best, ambiguous, and would be outweighed by the eyewitness identifications.

{¶61} We note that Hughes has one thing the applicant in *Johnson* did not: evidence of an alternative suspect. Witnesses described seeing only two men assail T.M., and everyone agrees that one of those was Reeves. If Hughes had substantial evidence suggesting McCoy was the other assailant—or if corroboration by an exclusion result would render such evidence compelling—then perhaps the cumulative effect of numerous exclusion results could tip the scales in his favor. But Hughes does not have such evidence. He has an uncorroborated affidavit from a codefendant that is in tension with Hughes's own story to police. That is not enough to meaningfully distinguish Hughes's case from *Johnson*.

3.

**{¶62}** Postconviction DNA-testing cases demand evaluation on a "case-by-case basis, based on the unique facts of each case." *Scott*, 2022-Ohio-4277, at ¶ 10. And under the unique facts of this case, we hold that results excluding Hughes as a possible contributor of biological material on the 13 listed items, viewed in the context of all the available evidence, would not create a "strong probability" of a different outcome at Hughes's trial. This is so whether we consider those exclusion results individually or cumulatively. Accordingly, we hold that the trial court did not abuse its discretion in concluding that the requested testing would not be outcome determinative and finding that Hughes had failed to satisfy the criteria in R.C. 2953.74(C)(4) and (C)(5). Because that was enough to deny Hughes's application, his second, third, fourth, and fifth assignments of error are overruled.

### III. CONCLUSION

**{¶63}** The trial court's December 23, 2024 judgment and order denying Hughes's November 13, 2023 application for DNA testing is affirmed.

Judgment affirmed.

**BOCK** and **NESTOR, JJ.,** concur.